EDWARD H. KUBO, JR.   #2499
United States Attorney
District of Hawaii

RONALD G. JOHNSON    #4523
Chief, Major Crimes Section

CHRIS A. THOMAS       #3514
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:     Chris.Thomas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 29 2008

at 2 o'clock and 30 min. P M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | ) | MAG. NO. 08-0916 |
|---|---|---|
| Plaintiff, | ) | CRIMINAL COMPLAINT |
| vs. | ) | |
| RYAN MATHERS,            (01) | ) | |
| CHARLES CARPER,          (02) | ) | |
| RONALD WILLIAM ABRAM, | ) | |
|    a.k.a. "Will"     (03) | ) | |
| JASON FLEGM,             (04) | ) | |
| MARK VAUGHT, and         (05) | ) | |
| BRENDON SHULTZ,          (06) | ) | |
| Defendants. | ) | |

CRIMINAL COMPLAINT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

> From on or about April 2008, to and including October 28, 2008, in the District of Hawaii, and elsewhere,

**RYAN MATHERS,**
**CHARLES CARPER,**
**RONALD WILLIAM ABRAM, a.k.a. "Will"**
**JASON FLEGM,**
**MARK VAUGHT,**
**BRENDON SHULTZ,**

> defendants herein, did intentionally and unlawfully agree and conspire, amongst and between themselves, and with others, known and unknown, to commit an offense against the United States, that is to knowingly sell, or in any manner, facilitate the sale of an article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States in violation of Title 18, United States Code, Section 554.

### OVERT ACTS

In furtherance of said conspiracy and to effect the objects thereof, the defendants performed overt acts in the District of Hawaii and elsewhere which include, but are not limited to, the following:

1. On or about September 24, 2008, CHARLES CARPER, in exchange for approximately $2,500.00, consummated a sale of an ITT Nightquest PVS-14 Gen 3 Night Vision Monocular (hereinafter "PVS-14 NVG") that he received from RYAN MATHERS.

2. On or about October 15, 2008, CHARLES CARPER, in exchange for approximately $5,072.00, consummated a sale of two PVS-14 NVGs, at least one of which he received from RYAN MATHERS.

3. On or about October 28, 2008, RYAN MATHERS, and RONALD WILLIAM ABRAM, a.k.a. "Will", agreed, coordinated and attempted to consummate the sale of 8 PVS-14 NVGs in exchange for $20,000.00 by showing up for the transaction with the 8 PVS-14 NVGs.

4. On or about October 28, 2008, JASON FLEGM, MARK VAUGHT, and BRENDON SHULTZ, knowing there was to be a sale of the PVS-14 NVGs appeared at the site of the transaction to act as lookouts, to facilitate security during the transaction and to ensure that the sale of the 8 PVS-14 NVGs was consummated.

All in violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent with Immigration and Customs Enforcement and that this Complaint is based upon the facts set forth in the attached "Affidavit in Support of Criminal Complaint", which is incorporated herein by reference.

_____
STEVEN MARCELENO
Senior Special Agent
Immigration and Customs Enforcement

Sworn to before me and
subscribed in my presence,
this 29th day of October 2008,
at Honolulu, Hawaii.

_____
The Honorable BARRY M. KURREN
U.S. MAGISTRATE JUDGE
District of Hawaii

U.S. v. Ryan Mathers, et al.
"Complaint"
Mag. No. 08-0916

3

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Steven J. Marceleno, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent (SA) with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) and currently assigned to the Special Agent-in-Charge (SAC) Office in Honolulu, Hawaii (HI). I am currently assigned to Group 4 and responsible for investigating Counter Proliferation Investigations. I have received extensive training in investigating violations of federal laws, to include laws and regulations governing the export of goods from the U.S.

2. This affidavit is submitted for the limited purpose of obtaining a criminal complaint. This affidavit sets forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested criminal complaint. This affidavit does not contain every material fact that I have learned during the course of this investigation, however, no information known to me that would tend to negate probable cause has been withheld from this affidavit. This affidavit is based upon my personal observations, investigation and experience, or but information that has been provided to me by other law enforcement authorities

3. The AN/PVS-14 Gen 3 night vision monocular device (hereinafter "PVS-14") is a night vision device used by all branches of the U.S. military. It can be mounted to a combat helmet or weapon or it can be hand held. The device allows soldiers to see at distances in low light and dark conditions. It can be used in conjunction with or to assist a sighting system attached to the soldier's weapon. The PVS-14 is a controlled good under the International Trafficking in Arms Regulations (ITAR) that is administered by the Department of State (DOS) and may not be exported without first having applied for and receiving a license. To apply for a license or to broker a deal involving ITAR controlled goods, an individual has to be registered with the DOS. It is contrary to law if a person brokers a deal involving ITAR controlled goods and that person is not registered with the DOS, and does not have a license. None of the defendants in this case registered with the DOS, or possesses the appropriate license.

4. On or about July 21, 2008, the affiant received information from ICE Cyber Crimes Center that CHARLES CARPER possibly sold a

PVS-14 on eBay to a person in Hong Kong and a person in Poland.

5.  On or about September 17, 2008, CARPER listed another PVS-14 in an eBay auction.

6.  On or about September 18, 2008, an ICE cooperating defendant (CD) placed a bid on the PVS-14 and made email contact with CARPER.  From about September 18 to about September 21, the CD communicated with CARPER through email and explained to CARPER that the PVS-14 would be exported to Hong KONG and the actual buyer was interested in purchasing more.  It was known that CARPER knew the PVS-14 was being exported prior to his completing the transaction because he asked the CD how many PVS-14s the buyer wanted.

7.  On or about September 22, 2008, the CD paid $2,500 plus shipping for the PVS-14.

8.  On or about September 23, 2008, CARPER directed that the PVS-14 be shipped to the CD through the U.S. mail.  The serial number had been removed from the unit, but the manufacturer was able to determine the unit serial number from the serial numbers located on components of the unit.  Based on the available serial numbers the unit was determined to be the property of the U.S. Marine Corps.

9.  From about September 21 to about October 13, 2008, CARPER and the CD negotiated the sale of two more PVS-14s.  CARPER stated that he had to check with people from a paintball team he use to play with to see if they were willing to sell their PVS-14s.  CARPER stated that he was only able to get two more PVS-14s.  The price was negotiated at $2,500 each.

10.  On or about October 14, 2008, the CD paid $5,000, plus shipping, for the two PVS-14s.

11.  On or about October 15, 2008, the two PVS-14s were shipped to the CD.  The serial numbers for both units had been removed, but the manufacturer was able to determine the unit serial numbers from the serial numbers located on the components of the units.  Based on the available serial numbers the units were determined to be the property of the U.S. Marine Corps.

12. On or about October 19, 2008, Ryan MATHERS listed a PVS-14 in an eBay Auction. MATHERS stated on the listing that he had purchased the PVS-14 from a gun show and had used it for paintball.

13. From about October 21 to about October 22, 2008, the CD communicated with MATHERS through email. MATHERS told the CD that he had two for sale right then and that he had been the source of the PVS-14s CARPER had sold to the CD.

14. On or about October 23, 2008, the CD placed a monitored call to MATHERS. During the call, the CD explained that he was buying the PVS-14s for an individual in Hong Kong and that the PVS-14s would be shipped to Hong Kong. MATHERS acknowledged by saying, "Okay". MATHERS stated that he might be able to obtain five more PVS-14s to sell to the CD. MATHERS agreed to show the two PVS-14s that he had in his possession to the CD the next day.

15. On or about October 24, 2008, MATHERS and Ronald "Will" ABRAM showed the CD the two PVS-14s in their possesion. The CD again explained that the PVS-14s would be exported to Hong Kong and that the money to pay for the PVS-14s would be coming from Hong Kong. During the meet, MATHERS explained that the PVS-14s were from members of a former paintball team. MATHERS explained that an individual named "Rob" may have three more PVS-14s that he might be willing to sell. MATHERS and ABRAM received a call during the meet and MATHERS told the CD that "Rob" agreed to sell the three PVS-14s plus an additional three PVS-14s for a total of eight. MATHERS also stated again that he had supplied CARPER with the three PVS-14s that CARPER previously sold to the CD, but that CARPER was no longer going to be given anymore PVS-14s. After the meet, two males, later identified as Brendon SCHUTZ and another individual, were observed meeting with MATHERS and ABRAM. It appeared that SCHULTZ and the other individual were conducting counter surveillance during the meet. MATHER and ABRAM were observed going back to MATHERS' residence after the meet.

16. On or about October 26, 2008, MATHERS left a message on the CD's telephone letting the CD know that a total of eight PVS-14s would be sold. The CD placed a monitored telephone call to MATHERS and confirmed that the CD would be buying eight PVS-14s and the cost would be $20,000. MATHERS made arrangements with the CD to meet on October 28, 2008, to exchange the PVS-14s for the money.

17. On or about October 28, 2008, MATHERS and ABRAM met with the CD to exchange the PVS-14s for the money. SCHULTZ, VAUGHT and Jason FLEGM were observed conducting what appeared to be counter surveillance and were observed roaming the area during the meet. They were observed to be in communication with each other through cellular telephones and the use of hand signals. Once the money had been exchanged, MATHERS, ABRAM, SCHULTZ, VAUGHT and FLEGM were arrested. CARPER was arrested at his residence a short time later.

18. On or about October 28, 2008, CARPER was warned of his constitutional rights and agreed to give a statement to the agents. CARPER stated that he had obtained the PVS-14s from MATHERS. CARPER stated that he had learned from eBay and other eBay users that it was illegal to sell the PVS-14s overseas. CARPER remembered selling two pair of PVS-14s to a man in Hong Kong and to another man overseas, but could not remember the country where the purchaser resided. CARPER stated that he felt the PVS-14s he was getting from MATHERS were stolen from the armory when he was negotiating the sale of the two PVS-14s to the CD at the end of September and beginning of October. CARPER also stated that he told MATHERS about the deal with the CD and MATHERS also told him that selling the PVS-14s overseas was illegal.

19. On or about October 28, 2008, ABRAM was warned of his constitutional rights and agreed to give a statement to the agents. ABRAMS stated that about four months ago, he and MATHERS discussed the PVS-14s MATHERS possessed in MATHERS' house. MATHERS told him at that time that he had a buyer in Japan, but he could not sell them because it was illegal to sell the PVS-14s overseas. MATHERS asked ABRAM if he wanted to go with him to show some PVS-14's to a guy (the CD) at Zippy's. ABRAM asked SCHULTZ and another individual to go with them to protect MATHERS and ABRAM in case something happened. SCHULTZ and the other individual did not ask any questions, but knew that they were going to make a deal for the PVS-14s. At the meet, the CD told ABRAM and MATHERS that the PVS-14s were going to a guy in Hong Kong. After the meet, MATHERS and ABRAM returned to MATHERS' residence and discussed the deal. ABRAM told MATHERS he wanted half of the money. MATHERS and ABRAM met at ABRAM's house on the day they were going to exchange the PVS-14s for the money. They called SCHULTZ and asked him to provide surveillance during the transaction. VAUGHT called to inquire what they were doing.

4

ABRAM did not give him all the details, but VAUGHT knew they were doing something illegal. VAUGHT brought FLEGM with him. They all went to Ala Moana Shopping Center. SHULTZ, VAUGHT and FLEGM were in ABRAM's Hummer. ABRAM and MATHERS were in MATHERS' truck. MATHERS carried the eight PVS-14s to the meet and showed the PVS-14s to the CD. ABRAM accepted the $20,000 in exchange and at that point law enforcement officers arrested all of the defendants who were present.

20. On or about October 29, 2008, the affiant learned from the manufacturer that the units seized from the meet on or about October 28, 2008 were the property of the U.S. government. Five belonged to the U.S. Marine Corps and three belonged to the U.S. Army.

    FURTHER AFFIANT SAYETH NAUGHT.

_[signature]_
STEVEN MARCELENO
Senior Special Agent
Immigration and Customs Enforcement

This Criminal Complaint and Affidavit in support thereof were presented to, approved by, and that probable cause to believe that the defendants above-named committed the charged crime was found to exist by, the undersigned Judicial Officer at 2:30 p.m. on October 29, 2008.

Subscribed and Sworn to Before Me,
this 29th Day of October 2008

_[signature]_
The Honorable BARRY M. KURREN
U.S. Magistrate Judge
District of Hawaii

5