```
 1                     IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,     ) CRIMINAL NO. 08-00655HG
 4                                  )
                  Plaintiff,        ) Honolulu, Hawaii
 5                                  ) June 27, 2012
           vs.                      ) 10:12 a.m.
 6                                  )
      RYAN MATHERS,                 ) EVIDENTIARY HEARING
 7                                  ) SENTENCING TO THE SECOND
                  Defendant.        ) SUPERSEDING INDICTMENT AS TO
 8    _____ ) COUNTS 1-11

 9

10                       TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE HELEN GILLMOR
11              SENIOR UNITED STATES DISTRICT COURT JUDGE

12
      APPEARANCES:
13

14    For the Government:      CHRIS THOMAS
                               Assistant U.S. Attorney
15                             District of Hawaii
                               Room 6100 - PJKK Federal Bldg.
16                             300 Ala Moana Blvd.
                               Honolulu, Hawaii 96850
17
      For the Defendant:       PETER C. WOLFF, JR.
18                             Federal Public Defender
                               Room 7104 - PJKK Federal Bldg.
19                             300 Ala Moana Blvd.
                               Honolulu, Hawaii 96850
20

21
      Official Court          GLORIA T. BEDIAMOL, RPR, RMR
22    Reporter:               United States District Court
                               P.O. Box 50131
23                             Honolulu, Hawaii 96850

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1                    I N D E X

 2

 3   GOVERNMENT'S WITNESSES:                          Page No.

 4     PHILLIP EUGENE MOTLEY
            DIRECT EXAMINATION BY MR. THOMAS              5
 5          CROSS-EXAMINATION BY MR. WOLFF               13

 6

 7

 8                    EXHIBITS                        Page No.

 9
       Government's Exhibit 3 was received in evidence    12
10     Government's Exhibits 2 and 2A were received in    26
       evidence
11     Government's Exhibit 4 was received in             31
       evidence
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Wednesday, June 27, 2012                          10:12 a.m.
 2              THE CLERK:  Calling case of Criminal Number
 3   08-00655HG, United States of America versus Defendant (01) Ryan
 4   Mathers.  This hearing has been called for an evidentiary
 5   hearing and sentencing.
 6              Counsel, your appearances for the record please.
 7              MR. THOMAS:  Good morning, Your Honor.  Chris Thomas,
 8   Assistant U.S. Attorney along with Benjamin Bumanglag of
 9   Homeland Security, Your Honor.
10              THE COURT:  Good morning.
11              MR. WOLFF:  Good morning, Your Honor, Peter Wolff,
12   Federal Public Defender, on behalf of Mr. Mathers.  Mr. Mathers
13   is present.
14              THE COURT:  Okay.  Now, Mr. Mathers, have you reviewed
15   the presentence report with Mr. Wolff?
16              THE DEFENDANT:  Yes, Your Honor.
17              THE COURT:  Okay.  And, attorneys, have you any
18   objections to the factual statements contained in the
19   presentence investigation report?
20              MR. THOMAS:  No objection, Your Honor.
21              MR. WOLFF:  I don't think so.  We don't have any
22   objections.
23              THE COURT:  Okay.  Your mic is not on or -- usually
24   it's on.
25              Okay.  Do you have any objections to the findings with
```

1   respect to the presentence report?  I believe you do, Mr.

2   Wolff.

3           MR. WOLFF:  We do, yes.

4           THE COURT:  Yes.  So now would be the time for you to

5   articulate them, and we will review them -- have argument with

6   respect to them.

7           MR. WOLFF:  All right, the only thing I might say,

8   Your Honor, which is a little bit off topic, is Mr. Motley is

9   in Roanoke ready to testify.  It might make sense to hear him

10  first and then take up --

11          THE COURT:  Okay.  You agree both to that, Mr. Thomas?

12          MR. THOMAS:  The government is agreeable, Your Honor.

13          THE COURT:  Okay.  Well then, he is your witness, why

14  don't you go ahead and introduce him and then we'll have him

15  sworn?

16          MR. THOMAS:  I appreciate it, Your Honor.

17          Sir, could you state your name for the record, please?

18          THE CLERK:  Could I swear him in first?

19          THE COURT:  Let's get his name on the record first. Go

20  ahead.

21          What's his name, Mr. Thomas?

22          THE WITNESS:  Phillip Eugene Motley.

23          MR. THOMAS:  Okay.  Could you raise your right hand so

24  you can be sworn in?

25                    PHILLIP EUGENE MOTLEY,

```
 1   called as a witness by the Government, having been first duly
 2   sworn, was examined and testified as follows:
 3            THE COURT:  Would you spell your name for the record,
 4   please?
 5            THE CLERK:  Mr. Motley, would you please state your
 6   name for the record and spell both your first and your last
 7   name?
 8            THE WITNESS:  Okay.  It's Phillip, P-H-I-L-I-P,
 9   Motley, M-O-T-L-E-Y.
10            THE COURT:  Can you hear me, Mr. Motley?
11            THE WITNESS:  It's pretty faint.
12            THE COURT:  Well, is that any better?
13            THE WITNESS:  That's better.
14            THE COURT:  Thank you.
15            Okay, Mr. Thomas, you may proceed.
16                       DIRECT EXAMINATION
17   BY MR. THOMAS:
18   Q    Mr. Motley, could you hear me?
19   A    I'm sorry, say that again?
20   Q    Can you hear me?
21   A    Yes, I can hear you.
22   Q    Mr. Motley, could you state your position, your
23   employment?
24   A    Yes, I'm employed by ITT Incorporated.  I'm in the trade
25   compliance department.  My title there is trade compliance
```

1   administrator licensing and logistics.

2   Q    Okay.  ITT, do they generate and produce night vision

3   goggles?

4   A    Yes.

5   Q    And do they generate that PVS/AN-14 night vision goggle?

6   A    Yes.

7   Q    Did you generate a declaration -- a five-paged declaration

8   for the case of U.S. versus Ryan Mathers in the District of

9   Hawaii?

10  A    Yes.

11  Q    In that declaration, did you set forth your background,

12  education, and work experience?

13  A    Yes.

14        MR. THOMAS:  Your Honor, I previously had discussions

15  with Mr. Wolff, defense counsel, and he has agreed that

16  Mr. Motley can be qualified as an expert with regard to trade

17  compliance of night vision goggles produced by ITT.

18        THE COURT:  Okay.  Correct, Mr. Wolff?

19        MR. WOLFF:  Yes, Your Honor.

20        THE COURT:  The Court finds, based on the material

21  available to it that has been submitted by the government and

22  the agreement of the parties that he is an expert in that area.

23        MR. THOMAS:  Thank you, Your Honor.

24  BY MR. THOMAS:

25  Q    Mr. Motley, we're interested primarily in the differences

1    between military specifications of the night vision goggle,

2    particularly the Generation Three, military specifications and

3    the difference with commercially available specifications.  So

4    first of all, are there night vision goggles, Generation Three,

5    that are produced by ITT in the commercial market?

6    A    Yes, a small percentage.

7    Q    And what is the remaining percentage?  What market is that

8    produced for?

9    A    We support -- we have several distributors to which we

10   sell night vision goggles, and they resell them.  We also

11   provide image intensifiers, which is the heart of the night

12   vision goggle, to OEMs who incorporate those two into their own

13   night vision equipment.

14   Q    Okay.  What is an OEM?

15   A    Original equipment manufacturer.

16   Q    Now, I'm interested primarily in the PVS-14 Generation

17   Three.  What does ITT produce with respect to that night vision

18   goggle?

19   A    We supply law enforcement, and we supply federal agencies

20   with the PVS-14.  Some of the OEMs we'll sell to those type of

21   agencies as well.

22   Q    Now, with regard to the night vision goggle -- and when I

23   say night vision goggle, from this point forward, I'm going to

24   be referring to the PVS-14 Generation Three.

25   A    Okay.

1  Q     Are those produced pursuant to military specifications?

2  A     Yes.  We start out with it that way as to be mil spec.

3  The heart of the goggle itself, meaning the image intensifier,

4  is an indeterminate manufacturing process, which means it

5  starts out to be the highest it could possibly be that we can

6  manufacture.  So based on environmental conditions and the fact

7  that there's a four hundred plus procedure that go into the

8  making of that tube, they -- it's a fallout process by which

9  some meet the mil spec and some exceed the mil spec in that

10  regard.  So it's a fallout process that we use.

11  Q     Are there some that do not meet the mil spec?

12  A     Yes.

13  Q     Could you give us an overview of the differences between

14  the military specification and any commercially available night

15  vision goggles?

16  A     It's a policy of ITT to reserve its highest quality night

17  vision goggles and tubes for the U.S. military.  Those that are

18  a fallout as not being of the quality that exceeds the mil spec

19  will be provided -- they would call them DATS -- and those

20  particular image intensifier tubes will be sold to other

21  parties in the United States, like I mentioned the OEMs, CUs.

22  The mil spec is a large document, about 26 pages long, that has

23  a variety of tests that have be to made on the image

24  intensifier.  In order for it to be a full mil spec goggle,

25  U.S. military spec goggle, it has to be a series of what we

1    call A, B and C tests.  Most people in the business of night
2    vision do not understand that.  They assume it's mil spec if it
3    just passes the A test, which is primarily the FOM, or the
4    figure of merit test, but there are three other tests they have
5    to go through as well.  And it has to pass those in order for
6    it to be considered a full mil spec image intensifier.
7    Q    You said that those that don't meet the mil spec, military
8    specifications, you qualify them as DATS.  Is that an acronym,
9    D-A-T-S?
10   A    Yes.
11   Q    And what does that --
12   A    That stands for downgrades available to sell.
13   Q    And, again, you said that they are available to sell to
14   these OEMs?
15   A    Yes, we sell them to the OEMs and the like.
16   Q    And those that -- those night vision goggles, which are
17   below military specifications, those may eventually reach the
18   commercial market?
19   A    That's correct.
20   Q    Now, with respect to the military specifications, the two
21   additional tests, does that have to do with the light
22   interference filter?
23   A    The light interference filter is actually an accessory to
24   the goggle itself.  It is a protective measure that's
25   classified, and it is not germane to the tube, but it protects

1    at the fiber in case a laser is pointing towards the goggle.

2    Q    So is that another distinction between military

3    specification and what you might be able to find on the

4    commercial market?

5    A    We do not sell live interference filters on the commercial

6    market.  We will occasionally -- federal agencies will ask for

7    the highest level that we have, and they will ask as well for a

8    live interference filter, and we will provide that if it's a

9    federal agency.

10   Q    Now, with respect to allies of the United States, are

11   night vision goggles sold to allied countries?

12   A    Yes.

13   Q    Does ITT have to go through the same U.S. Department of

14   States Director of Defense Trade Controls in order to sell to

15   allied countries?

16   A    Yes.

17   Q    What is the -- how often are night vision goggles sold to

18   allied countries?

19   A    The market has changed since the deposition I gave

20   earlier.  We were so busy supplying the U.S. military that we

21   were running 24/7, and we were about 93 percent that was

22   dedicated to the U.S. military.  Now that the wars are dying

23   down and that the defense budget has been cut, we have had to

24   turn back towards the international market as well, and so the

25   percentage is changing.  It's not up to 50 percent now, but

```
 1   it's more than it was.  It certainly is more than 70 percent.
 2   It's probably now in the neighborhood of, I would guess,
 3   20 percent now.
 4   Q    Is there a difference between the night vision goggles
 5   sold to allies and the night vision goggles retained for U.S.
 6   military forces?
 7   A    Yes, there are performance differences that are determined
 8   by the Department of Safety and the Export License
 9   Authorization.
10   Q    And I don't want to assume anything, so which night vision
11   goggle is of a higher standard than the other?
12   A    I'm sorry, I did not understand the question.
13   Q    Are the night vision goggles that are retained for the
14   U.S. military forces of the highest standard that ITT produces?
15   A    Yes.
16   Q    Now the DATS, the downgrades available to sell, you
17   indicated that that might reach the commercial market.  What is
18   the percentage approximately of the night vision goggles that
19   ITT produces that may reach the commercial market?
20   A    In the deposition I gave, if I remember correctly at this
21   point, it was about seven percent when I went through our data
22   at that particular time back in I think 2010, if I remember
23   correctly, when I gave the data.  Right, in 2010.  It was
24   actually five and a half percent, not seven percent.  And then
25   for all types of image intensifiers it was almost eight
```

1    percent; but for the goggles themselves -- so for the --

2    Q    PVS-14.

3    A    -- PVS-14 it was approximately five percent.

4    Q    So all of the opinions that you testified, and with regard

5    to the difference between commercially available and night

6    vision goggles that are retained for the U.S. military, those

7    opinions or statements of fact are contained in your

8    declaration dated February 11, 2011?

9    A    Yes.

10         MR. THOMAS:  Your Honor, at this time the government

11   moves to admit what has been marked as Exhibit 3, which is the

12   declaration of Mr. Motley.

13         THE COURT:  Okay.  And did you wish to admit his

14   vitae?

15         MR. THOMAS:  I'm sorry, Your Honor?

16         THE COURT:  I thought we had a -- I guess it's part of

17   his declaration.

18         Any objection, Mr. Wolff?

19         MR. WOLFF:  No, Your Honor.

20         THE COURT:  Okay.  It is received.

21      (Government's Exhibit 3 was received in evidence.)

22         MR. THOMAS:  Thank you, Your Honor.  No further

23   questions.

24         THE COURT:  Did you wish to inquire, Mr. Wolff?

25         MR. WOLFF:  Yes, Your Honor.

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. WOLFF:

3    Q    Mr. Motley, can you hear me?

4    A    Yes, sir.

5    Q    And do you have your declaration that you signed in

6    February of 2011 available to look at?

7    A    Yes, sir.

8    Q    Let me direct your attention to the last page, page five.

9    A    All right.

10   Q    The paragraph 12 that's where you discussed the downgrades

11   available to sell versus the tubes that go into the ones that

12   are manufactured for the U.S. military.  Do you see that?

13   A    Yes, sir.

14   Q    And at least it appears that as of the time when you had

15   this declaration 94.52 percent of the image intensifying tubes

16   went to military or federal customers and 5.48 percent went to

17   or were available to commercial customers; is that right?

18   A    Yes, sir.

19   Q    And that accounts for a hundred percent of the tubes that

20   are manufactured, correct?

21   A    Of the F9815 tubes, yes.  That doesn't count for all the

22   other types of tubes that we have, but that's just for the ones

23   that go into the PVS-14.

24   Q    Okay.  Well, that's what I'm focusing on.  So is it fair

25   to infer from that that, given the complexity of this

1   manufacturing process and the four hundred steps necessary to

2   make an image intensifying tube, that some of the tubes, a

3   small percentage, aren't good enough to be used for the

4   military PVS-14?

5   A    The military versus for what we sell to the U.S.

6   government, that's correct.

7   Q    But the ones that are not good enough for the military are

8   good enough for the commercial market?

9   A    Yes, sir.  They can be for the commercial market.

10  Q    There are no tubes had that go through this process that

11  just end up as garbage or have to be thrown away completely?

12  A    There are some that are just so ridiculously bad we can't

13  use them at all.

14  Q    Okay.  Now, you indicated that there's three separate

15  testing protocols that any tube has to go through before it can

16  meet the full mil spec; is that right?

17  A    It's actually four, A, B, C and D.

18  Q    Okay.  So A is -- you referred to as, that's the figure of

19  merit?

20  A    It's primarily the one figure of merit that most people

21  recognize with it in that regard.

22  Q    Okay.  And figure of merit is discussed in your

23  declaration at paragraph nine, correct?

24  A    Right.

25  Q    And so figure of merit is essentially, to quote you, a

1   qualitative measure of an image intensifier tube's maximum

2   performance capability.  It's the resolution times the signal

3   to noise ratio?

4   A    Yes, sir.

5   Q    So is it correct to state it in kind of a layperson's term

6   that the figure of merit will basically -- is a way to talk

7   about the quality of the image that you would get if you are

8   using that particular tube in an image intensifying night

9   vision goggle?

10  A    It's part of it.  Here's what I mean by that.  Yes, it's

11  partially the case.  The figure of merit is the line pairs, and

12  that's based in comparison to Air Force 1951 chart that our

13  employees use to actually measure how many line pairs they can

14  see distinctly with it.  And that gives you the -- that tells

15  you how good an image you are going to have to be able to see

16  lines on any object, any corners on objects and the like.

17       The other part of that has too deal with the signals,

18  the noise part of it.  And that really is the average

19  amplification of the electrons and the protons multiplied

20  thousands of times, how bright that is, as divided by a

21  standard deviation of brightness to give you an idea of how

22  bright the image is and how clear the image is.

23       There are other things that can make the tube

24  unacceptable for mil spec.  There may be scratches on it, there

25  may be shading on the tube itself, meaning that part of the

1    tube is not good, it may have spots where it did not go all the

2    way through.  And I can't get into the particulars of that, but

3    you may have three or four spots and therefore we have to have

4    what we call lesions on the tube.  The mil spec for the U.S.

5    military says you you're going to have so many spots in that

6    region of a certain particular diameter.  And there may be

7    several other things that can happen.  There could be blooming

8    in it.  And that means when the light comes through and gets to

9    the end, it comes out and it kind of balloons out.  And it

10   obscures -- so there's a variety of factors beyond just FOM

11   that can affect the quality of the tube.

12   Q    All right.  So these other things that you're talking

13   about, are those part of the B, C and D tests, or is that all

14   part of the A test?

15   A    Yes, it is part of the B, C and D test.  Most people just

16   think it's the A test.  There are other tests that are

17   involved.

18   Q    And so if a tube passes A, B and C but fails D, that can't

19   be used to manufacture an NVG for the U.S. military?

20   A    Correct.  It has to go through all the four tests and pass

21   all of them.

22   Q    So do you have in front of you the exhibits that I filed

23   and that Mr. Thomas e-mailed to you?

24   A    Yes, I do.

25   Q    So if you will look at Exhibit A.  This is the internet

1   advertisement essentially for a PVS-14 mil spec apparently

2   manufactured and at least sold by KERIF Night Vision.  Do you

3   see that?

4   A    Yes, sir.

5   Q    All right.  So if you look down on paragraph it says,

6   "This 'Top-of-the-line' full mil spec AN/PVS-14 Monocular kit

7   from KERIF Nigh Vision uses only the highest quality L-3 or ITT

8   image tubes, optical lenses," etcetera, etcetera.

9             Is it your view that that claim in there is actually

10   not a true claim that KERIF is making about this?

11   A    I would not -- I would not qualify it to say that that is

12   a well-qualified statement.  No, it's not.

13   Q    So it's basically a false statement?

14   A    Well, it's high quality, but it's not the highest quality.

15             MR. THOMAS:  Well, Your Honor --

16             THE COURT:  Hold on.  Wait, sir.  Sir.

17             MR. WOLFF:  Wait.  Mr. Motley, here's what happened.

18   Mr. Thomas has an objection and before you go ahead, the judge

19   needs to rule on it.  So with this delay, it's kind of hard to

20   tell that that's going on. So we're going to stop for a second.

21             THE COURT:  Go ahead, Mr. Thomas, articulate your

22   objection.

23             MR. THOMAS:  It's lack of foundation, Your Honor.  He

24   is asking Mr. Motley to make a comparison.  Mr. Motley knows

25   about ITT night vision goggles, but he has no idea what KERIF

1   may be producing.

2          THE COURT:  I'm going to sustain the objection.  If

3   you want to try to lay a foundation you may, Mr. Wolff.

4   BY MR. WOLFF:

5   Q    All right.  Mr. Motley, this page from KERIF indicates

6   that they're using -- or at least sometimes they are using ITT

7   image tubes.  Is that true to your knowledge?

8   A    I do not know this particular vendor.  I can't answer

9   whether or not they do indeed have night vision tubes.  I'm

10  unaware of this particular party.  They certainly -- L-3 and

11  ITT are the two U.S. manufacturers of Gen Three tubes in the

12  United States.  So it's very possible that they could have

13  tubes from us as well as L-3.

14  Q    All right.  L-3 is a competing manufacturer of night

15  vision goggles?

16  A    Correct.

17  Q    All right.  So if one assumed that this seller did have

18  ITT image tubes, it would be part of the downgrades available

19  to sell; is that right?

20  A    Yes.

21  Q    And if it was part of what ITT supplies to commercial

22  market as downgrades available to sell, that would indicate

23  that the tube had failed to meet some aspect of the full

24  military specification, either A or B or C or D?

25  A    Correct.

1   Q    All right.  And so if that were true, that it was an ITT

2   tube, which is downgraded available to sell, stating that it

3   was a full military spec would not be completely accurate;

4   would you agree with that?

5   A    That's correct.  We have actually had cases where some of

6   our vendors have sold them even to farm parties as if they were

7   full military spec, and the farm parties have gotten them and

8   they realized that those particular tubes were not full

9   military spec, and they have actually taken to court some of

10  the vendors with regard to that because they claim they were,

11  but they were not, and they could recognize the difference.

12  Q    All right.  So can you look at Exhibit B?  This is another

13  internet page having to do with U.S. night vision.  So if you

14  look down in that first paragraph, it indicates that the -- it

15  says, "US Night Vision PVS-14A monoculars come with a

16  Generation 3 intensifier tube, developed by ITT Industries for

17  high performance and image resolution."  Do you see that

18  statement?

19  A    Looking for it.  I see it now, okay.

20  Q    All right.  Do you know whether US Night Vision is a

21  company that ITT does business with and supplies image

22  intensifier tubes to?

23  A    I'm not a hundred percent.  I know we do have a night

24  vision -- I don't know the names of the vendors very well, so I

25  can't really answer the question definitely yes or no.  I'm

1    sorry.  I just don't know all the vendors.

2    Q    Does ITT itself participate in the commercial market by

3    selling NVGs which are using tubes which are downgrades

4    available to sell but participate in that market under some

5    other name than ITT?  In other words, does ITT have a

6    commercial outlet for its downgrades available to sell which

7    goes by some other name?

8    A    One earlier in our history we did have a commercial

9    market, and we would sell directly commercial.  We've gotten

10   out of that market.  That's been discontinued.  We do have like

11   what we call the PVS-14 for law enforcement, that would be, we

12   call it -- if I remember the name -- PVS-14 I think is right.

13   And that we do sell to law enforcement in the United States and

14   to other security states.  It's usually done through one of

15   these vendors that they sell.

16   Q    All right.  So in terms of the relative quality of a full

17   mil spec PVS-14 that ITT is selling to the U.S. military and

18   the commercially available ones that are sold by other vendors

19   in the commercial market, is it fair to say that the military

20   spec ones are of a higher quality, but just how much higher

21   quality depends on the characteristics of each individual image

22   intensifying tube that is manufactured into the particular

23   device?

24   A    (Inaudible response.)

25        Your sound went away. Can you still hear me?

1          THE COURT:  Did you hear the question, sir?

2          THE WITNESS:  I heard the question.  I said, that's

3     correct.

4          THE COURT:  Okay.  Thank you.

5          MR. WOLFF:  All right.  There was a moment when you

6     were talking, I could see your lips moving, but there was no

7     sound.

8          THE WITNESS:  I'm not sure what happened.

9          THE COURT:  Let's proceed, Mr. Wolff.

10    BY MR. WOLFF:

11    Q    You indicated also, Mr. Motley, that there's another

12    distinction between the military NVGs that are sold to the

13    military and those that are commercially available.  And that

14    has to do with the light interference filter; is that right?

15    A    (Inaudible response.)

16         MR. WOLFF:  Your Honor, Mr. Motley is apparently

17    hearing me.  He is answering, but we're not hearing his answer.

18         THE COURT:  Mr. Motley, you heard the question,

19    correct.

20         THE WITNESS:  I heard on my end, but it sounds like

21    somebody is typing.

22         THE CLERK:  That's me.  I'll stop typing.

23         THE COURT:  Can you answer the question, sir, or do

24    you need it repeated?

25         THE WITNESS:  Repeat it again please.

1           THE COURT:  Okay.  If you would, Mr. Wolff.

2    BY MR. WOLFF:

3    Q    The question was basically another difference between the

4    NVGs that are sold to the military and those that are available

5    in the commercial market, is the military ones contain the LIF,

6    or light interference filter, and the commercial ones do not?

7    A    Correct.

8    Q    And the light interference filter is a separate technology

9    that its purpose is to protect the person using the NVG from

10   the harm that would occur if, for example, a laser was shined

11   at the person using the NVG?

12   A    That's correct.

13   Q    All right.  And so that technology is not incorporated

14   into any commercial products, as far as you know; is that

15   right?

16   A    That's correct.  As I stated earlier, I said that

17   sometimes federal agencies will have the LIF included -- and we

18   will on occasion grant that and give them that.  But we do not

19   sell the LIF to any person off the street in the United States

20   or anywhere.  It's primarily for the U.S. government.

21   Q    All right.  But is it also true that the light

22   interference filter was the subject of ITT's own problems in

23   violation of the Export Control Act?

24   A    It was.

25   Q    And, in fact, that technology was exported, contrary to

1    U.S. law, to the United Kingdom, Singapore and The People's

2    Republic of China; is that right?

3    A     Unfortunately that's true.

4    Q     All right.  And ITT was convicted of that and paid a

5    rather substantial fine; is that right?

6    A     (Inaudible response) -- thus far.

7    Q     We missed that last answer, Mr. Motley.

8    A     The largest one thus far at that point in time.

9    Q     Do you happen to know whether any individuals who had in

10   some way participated in this violation where themselves

11   prosecuted or was only the corporation prosecuted?

12   A     To my knowledge only the corporation was prosecuted.

13         MR. WOLFF:  All right.  I don't have any further

14   questions, thank you.

15         THE COURT:  Thank you, Mr. Wolff.

16         Do you have any redirect, Mr. Thomas?

17         MR. THOMAS:  No.  Thank you, Your Honor.

18         THE COURT:  Okay.  Thank you, Mr. Motley, we are going

19   to excuse you now.  We appreciate your cooperation.  That's it.

20   Thank you.  We're going to shut down.  Okay.

21         Is the other person on video as well?

22         MR. THOMAS:  No, Your Honor, I had discussions with

23   Mr. Wolff and Mr. Kevin McConnell (verbatim), he is a retired

24   colonel, Your Honor, he previously testified in this case on

25   February 22, 2011, and he was subject to cross-examination by

 1    Matt Winter who was his defense counsel at that time.  So in
 2    light of that prior opportunity to testify, Mr. Wolff is
 3    agreeable that Government Exhibit 2, which is the declaration
 4    of Kevin McConnell (verbatim), will be admitted as evidence,
 5    and the matters contained in his declaration would have been
 6    the subject of his testimony, Your Honor.
 7            THE COURT:  Okay.  So as I understand what you're
 8    saying, Mr. Thomas and Mr. Wolff, we're -- I'm not going to go
 9    to any cross-examination.  You are both satisfied with the
10    admission of the declaration of Colonel Kevin M. McConnell
11    (verbatim).
12            MR. WOLFF:  It's actually McDonnell, Your Honor.
13            THE COURT:  McDonnell, yes.  Thank you.
14            MR. WOLFF:  My understanding was slightly different,
15    Your Honor, which was that since Colonel McDonnell had
16    testified that the Court could consider his declaration and the
17    prior testimony, which is memorialized in the transcript which
18    I reviewed, so I had assumed that both would be before the
19    Court.
20            THE COURT:  Which exhibit is that?
21            MR. WOLFF:  Well, I think actually it's not an
22    exhibit.  However --
23            MR. THOMAS:  Your Honor, I have a copy of the
24    testimony that was given on February 22, 2011.  With the
25    Court's permission, I can give this to the Court for the

1    hearing this morning, and I can amend the exhibit list to

2    include this transcript, Your Honor, at a later time.

3         MR. WOLFF:  That's fine.

4         THE COURT:  Well, we can just make it an exhibit and

5    make copies and we'll just take it in now.  We're here for the

6    sentencing, so if you would provide it to me and let me see

7    whether I need a break to read it or whether it's not so long

8    that I can't just do it at this moment in time.

9         If you want me to read this, then I can do that at

10   this point in time.  I'm assuming that this is part of the

11   information you want the Court to consider in terms of your

12   objections, correct?

13        MR. WOLFF:  Yes, Your Honor.

14        THE COURT:  Okay.  Well, we will take a short recess,

15   and I am looking at the proceedings recorded at the

16   February 22, 2011 sentencing of Mr. -- sentencing hearing of

17   Mr. Mathers in Criminal Number 08-655DEA.  And this is the only

18   thing that I'm considering from that, there isn't anything

19   else, and that sentencing did not go to fruition.

20        MR. WOLFF:  That's true, Your Honor.

21        THE COURT:  Okay.  So we're going to take a

22   five-minute recess and I will consider it and then we'll

23   proceed.

24   (Recess at 10:52 a.m. until 11:05 a.m.)

25        THE COURT:  We're back on the record with counsel,

1   case agent, and the defendant are present once again, and the

2   probation officer.

3          I have reviewed both the declaration, which I

4   understand you agreed to admit, and I want to limit what we're

5   putting in -- you can be seated -- as evidence.  Because in

6   this transcript it has other matters discussed and it is only

7   on page nine through I guess 18 that we have the testimony.

8          So what I'm going to ask Ms. Sai to do is copy this

9   with just that and the cover sheet and make that -- now that

10  would be -- is that going to be the government's or the defense

11  exhibit?  Two is the government's exhibit, the declaration, and

12  this we have up to 4.

13         Yes, Mr. Thomas?

14         MR. THOMAS:  Do you know want to designate it as 2A,

15  Your Honor?

16         THE COURT:  Okay.  That's probably a good idea.

17         Are you okay with that, Mr. Wolff?

18         MR. WOLFF:  Yes, Your Honor.

19         THE COURT:  And we will place that into the record as

20  something that the Court has considered along with Exhibit 2.

21  So 2 and 2A are received.

22    (Government's Exhibits 2 and 2A were received in evidence.)

23         Now, anything else, Mr. Thomas?  You are putting on

24  witnesses?

25         MR. THOMAS:  Yes, Your Honor, I just have one more

1    witness and this is with regards to Exhibit 4, Your Honor. I

2    hadn't expected that I would need him, but it shouldn't take

3    very long.

4           MR. WOLFF:  Well, Your Honor, before we get there,

5    Exhibit 4 is something that was filed this morning.

6           THE COURT:  Yes.

7           MR. WOLFF:  So that would be my first objection to it.

8    Then I guess I'll wait to see what else we hear, if the Court

9    is going to hear from this witness.  I understand he is talking

10   about Exhibit 4.

11          MR. THOMAS:  Well, Your Honor, Exhibit 4 are documents

12   that were seized pursuant to a search warrant from the

13   residence of Mr. Mathers.

14          THE COURT:  I believe they're mentioned in the

15   presentence report, are there not?

16          MR. THOMAS:  Paragraph 28.

17          THE COURT:  Now, I just want to go on record with

18   respect to the presentence report.  I asked Ms. Sai to call you

19   and let you know what had been done.  In looking at the

20   documents, I called and asked that the different paragraphs

21   that been changed all be put into one presentence report

22   because I believe that we had this piecemeal PSR that was very

23   difficult to follow.  And I was concerned particularly with us

24   being all on the same page as to what paragraphs were the

25   current relevant paragraphs.  And I was also concerned because

1    the PSR follows the defendant to the Bureau of Prisons, and I

2    would like to have a cohesive document which is the actual

3    product of an awful lot of work by everyone.  And so there

4    wasn't anything that was changed.  It was just a matter of

5    making it into a cohesive document that we all could work from.

6          But I do remember this being mentioned in the -- I

7    believe in the presentence report and Mr. Thomas has pointed

8    out it's paragraph 28.

9          So your objection is because you didn't know they were

10   going to put it forward, Mr. Wolff?

11         MR. WOLFF:  That's one of my objections, Your Honor.

12   But the principal objection is this.  Between paragraph 28,

13   which I am looking at, and a description of this as Exhibit 4

14   in the document that was filed this morning, there's a critical

15   new thing which was introduced, which I believe is largely not

16   true.  Because the exhibit is described as defendant Ryan

17   Mathers's handwritten notes.  And two pages of this document

18   Mr. Mathers, when I discussed it with him this morning, agrees

19   that he wrote two pages -- he is not sure he might have

20   written, he can't tell -- and then the other pages he believes

21   he didn't write.  Although he doesn't quarrel with the fact

22   that they were in a notebook that was seized from his home.

23         So if you want me to detail which pages are which, I

24   can do that.

25         THE COURT:  I'm looking at 28.  And is there another

1    place -- it talks about taking things from his home -- okay,

2    from his residence and then in addition the investigators

3    executed a search warrant of his vehicle -- okay.  We're only

4    talking about the matters found in his home.  Okay.

5           MR. WOLFF:  Correct.

6           THE COURT:  Okay.  Paragraph 28 says, "From Mathers'

7    residence, investigators recovered seven Gen 3 devices, three

8    Bushnell binoculars, a Trijicon rifle combat scope and a

9    notebook.  In the notebook, investigators observed handwritten

10   notes which listed the rules and regulations regarding the sale

11   or exportation of military items."

12          Okay.  So this doesn't say that they were his notes.

13   It just says there were notes that he had possession of.

14          MR. WOLFF:  Right.  And if all we were talking about

15   was the last two pages of this exhibit, which are pages -- if

16   you look at the lower right-hand corner, they're marked with a

17   bunch of zeroes and then it's like 622 and 623.

18          THE COURT:  Yes.

19          MR. WOLFF:  I wouldn't be making this objection

20   because those are the two pages that he acknowledges, at least

21   in discussing with me, are his handwriting.  But these other

22   pages, that's not the same story.  I wouldn't be quarrelling

23   about these last two pages if they were filed on the morning of

24   the sentencing just because, well, okay, they are more or less

25   discussed rather obliquely in paragraph 28.  He tells me, Yeah,

1   I wrote those.  But the other ones are a different kettle of

2   fish.  And they are not about the subject that's in paragraph

3   28, and I think they are highly prejudicial.  And even more

4   problematic than that is some of them aren't even written by

5   him as he recalls it.

6          THE COURT:  Well, okay.  Mr. Thomas.

7          MR. THOMAS:  Your Honor, I appreciate Mr. Wolff's

8   identifying the two pages that Mr. Mathers is agreeable to have

9   written.

10         But, Your Honor, the government isn't submitting it as

11  evidence of writings of Mr. Mathers.  All the government is

12  submitting it as evidence is the fact that this notebook was

13  found in his residence.

14         MR. WOLFF:  Why is it relevant, if it's not something

15  that he wrote or adopted or that provides some insight into

16  what he was thinking at or around the time these offenses were

17  committed three or four years ago?  It can't be useful to the

18  Court if there isn't an inference that it's something he ought

19  to be held responsible for.

20         THE COURT:  I haven't actually read them.

21         MR. WOLFF:  Better yet.

22         THE COURT:  Pardon?

23         MR. WOLFF:  Better yet.

24         THE COURT:  Well, they only came in this morning.  I

25  always say at this juncture it's really not Carnac where I put

1   it up against my forehead.

2          What's your position, Mr. Thomas, with respect to

3   this?  What are you putting them forward for?

4          MR. THOMAS:  Your Honor, it goes to the history and

5   characteristics of the defendant as well as recidivism.  But,

6   Your Honor, the government is agreeable that the last two pages

7   in Government's Exhibit 4, 622, 623, just those two pages be

8   admitted into evidence.

9          THE COURT:  Okay.  And the purpose of that,

10   Mr. Thomas, why are you putting them forward?

11          MR. THOMAS:  Your Honor, that is being put forward

12   based on the nature of the offense that was committed.  And

13   also it would go to the history and characteristics of

14   Mr. Mathers.

15          THE COURT:  Okay.  So you are only putting forward

16   Bates stamp 622 and 623?

17          MR. THOMAS:  Yes, Your Honor.

18          THE COURT:  And the other pages, the handwritten pages

19   in 4, you are not putting forward as evidence.

20          And you are agreeable to that, Mr. Wolff?

21          MR. WOLFF:  Yes, Your Honor.

22          THE COURT:  Okay.  The Court is going to receive the

23   two -- as Exhibit 4, 622 and 623.

24          (Government's Exhibit 4 was received in evidence.)

25          MR. THOMAS:  Thank you, Your Honor.  The government

1   has nothing further regarding the evidentiary hearing.

2          THE COURT:  Okay.  All right.  Now, if you could

3   articulate your objections at this juncture?  I have a pretty

4   good idea what they are, Mr. Wolff, but I don't want to spend

5   any time on something that you may have decided you don't want

6   to pursue.

7          MR. WOLFF:  So I think our basic quarrel -- could I

8   move up here?

9          THE COURT:  Yes, sure.  It might be a little better.

10          What I'm looking for at this point -- I think in terms

11   of sentencing disparity, you're going to argue that at

12   sentencing.

13          MR. WOLFF:  Right.

14          THE COURT:  But role in the offense and the sentencing

15   guidelines I think are relevant now, and Kimbrough and those

16   arguments I think go also into the final colloquy with respect

17   to sentencing.  But I do want you to put on your record your

18   objections so that we can rule on them with respect to the

19   presentence report.

20          MR. WOLFF:  All right.  So the history of this

21   guideline indicates -- actually, as far as I'm concerned, that

22   whoever was the staff member at the sentencing commission who

23   both drafted the guideline when it changed and drafted the

24   commentary that said it wasn't intended to change anything,

25   that person should be dismissed from further work for the

1    sentencing commission.

2         Because the problem with this guideline is this.  When

3    it was changed, it purported -- the commissioner purported not

4    to intend to change how it applied.  But then the language they

5    used seems to actually not accomplish that very well.

6         So we think that the guideline, since it was not

7    produced by the commission in its institutional role of using

8    empirical evidence and so forth, is a guideline that shouldn't

9    be applied.  I'm talking about the base offense level of 26.

10   We think that consistent with what the commission thought it

11   was doing, and at least with what some district courts have

12   done and the government has agreed ought to be done in other

13   cases, not this case, that the court ought to use the lower

14   guideline that seems, by its plain language, that maybe it

15   really wouldn't apply.

16        And if the Court is not willing to do that, then the

17   Court ought to exercise its discretion under Kimbrough and

18   indicate that it has a policy disagreement with this.  And the

19   reason is that the base level of 26, if it's applied, would

20   apply not only to the exportation of night vision goggles, but

21   it also would be the same base offense that would apply to

22   chemical weapons, helicopter bombs, war fighting planes,

23   etcetera, etcetera.  And the cases that we have collected and,

24   in fact, that the justice department collected in the history

25   of prosecution under this relevant statute indicate that all

1    that is true.

2        So it doesn't seem to me to make any sense that the

3    same guideline would apply across the board in a way that lumps

4    together night vision goggles, which are of a better quality,

5    but it's hard to tell how much of a better quality than things

6    that you could buy on the commercial market, with the export of

7    helicopters or war planes or things like that.

8        THE COURT:  Mr. Wolff, I can understand your policy

9    argument at this point.  But after the decision in Carper,

10   we've got a ruling in the Ninth Circuit with respect to this

11   question, do we not?

12       MR. WOLFF:  Well, we do.

13       THE COURT:  And in this case.

14       MR. WOLFF:  Right.  And here's the problem with going

15   second in these matters.  The argument that we made here was

16   never made in Carper.  Carper was arguing something almost the

17   opposite of what we were arguing.  Carper was arguing that the

18   night vision goggles were the same as arms.  And the reason

19   Carper was doing that was because the number of night vision

20   devices that he was held responsible for was less than ten.

21       So what Carper was saying is the NVG is the same as a

22   nonfully automatic small arm.  And since my number didn't

23   exceed ten of the NVGs, I should be at base offense level 14.

24   And that was the whole thrust of Carper's argument.

25       THE COURT:  Isn't it really the same argument that

1    essentially in the sense it's saying these are minor things

2    that should be classified in the same way as the small arms

3    basically.  I mean -- and then Carper had an advantage in that

4    he had a number, so he really had a double argument which

5    failed.

6           MR. WOLFF:  Well, except that what Carper's argument

7    was based, because I read a brief, Carper's argument was based

8    on the proposition that the historical use of the term "arms,"

9    which Carper was arguing should be applied in his case,

10   included things like the rifle issued to a soldier, bayonets,

11   canteens, military uniform, battle dress, that sort of thing.

12   So he was saying that somehow if you look at the term "arms" in

13   the guideline, and you're dealing with less than ten, you'll

14   come out with a notion that NVGs are arms.  And since it's

15   under ten, he is at 14.

16          So you could make -- you could say that what he was

17   saying was treating them more seriously than small arms was the

18   wrong policy.  But he was actually making kind of a technical

19   argument based on a definitional use of the term "arms."  And

20   he never made the argument we made.  And, of course, then the

21   circuit court never considered it except maybe obliquely.

22   Because if you look -- if you read the Carper decision, there

23   was a policy argument raised for the first time on appeal,

24   which the court rejected, because it had not been preserved.

25   So there was some talk in the appellate brief about --

1          THE COURT:  Well, that's sort of my point.  I think

2     you've already lost on the definition of them being in the

3     wrong category.  I think you're really only left with the

4     policy argument.

5          MR. WOLFF:  Well, you may well be right, Your Honor.

6     But here's what irks me about the fact that you might be right.

7     Courts -- appellate courts are always telling us that they are

8     not deciding issues that aren't before them, then they decide

9     an issue based on what's before them.  And then later they say,

10    oh, yeah, we decided that even though it wasn't before us.  So

11    that's why I'm trying to make this distinction.

12         As a district court, maybe you don't have any choice

13    really but to say Carper rules our world at least in this

14    particular case.  But I thought it was worth at least pointing

15    out that none of the arguments that we made in this case were

16    before Judge Ezra in Carper, and they weren't really before

17    this circuit court because, one, they weren't made or two when

18    they were made the first time on appeal the court said, well,

19    we're not going to consider that.

20         THE COURT:  I agree with you though.  It seems to me

21    that it's the same argument to a certain sent to say, we don't

22    fall into -- aside from the policy, we don't fall under the 26,

23    we fall under the 14.  And I've got to tell you I actually have

24    a problem with that because the definition of 14 is as clear as

25    it is.

1           MR. WOLFF:  Right.

2           THE COURT:  You want a chance to argue, Mr. Thomas,

3    but you're not losing any ground here, so I'm not sure you

4    really want to take the time.

5           MR. THOMAS:  We're taking time.  Your Honor, I argued

6    before the Ninth Circuit on this case.  The policy argument was

7    made by Carper's attorney because that attorney relied on U.S.

8    v. Oldani which is a policy argument.  And that argument is

9    U.S. v. Oldani, which cites Kimbrough.  And so in the Carper

10   decision on the last page it says, A district court may vary

11   from the guidelines if it agrees with them on policy grounds.

12   And it cites Kimbrough in Carper.  And then it says, There is

13   no obligation for a district court to do so.  So it considered

14   that.  And it ruled on it, Your Honor.

15          MR. WOLFF:  Well, what I think what the appellate

16   court was saying is that if the defendant doesn't raise the

17   policy argument for the district court, the district court is

18   not obligated sua sponte to take it up on its own volition, and

19   we're not obligated on appeal to tell you anything other than,

20   Hey, you didn't preserve this below; so you're done here.

21   That's the way I read it.

22          THE COURT:  They are reviewing it for plain error.

23          MR. WOLFF:  Right.

24          THE COURT:  But what my point, and maybe I'm

25   belaboring it, is the Ninth Circuit doesn't agree with you that

1    the technology of night vision falls into 2 -- A2.  It says

2    that's not the definition.  We read it, and that's not the

3    definition.  It doesn't belong there.  It belongs in 1.

4         So I don't think that could be any clearer.  And so

5    what I said was all you have left is the policy argument.  And

6    I tend to agree with you, with respect to whether they consider

7    that.  But then the question then becomes what I think about

8    it.

9         MR. WOLFF:  Right.  Right.

10        THE COURT:  So I'm not sure if you want to argue that

11   point at this juncture.

12        MR. WOLFF:  Well, I guess I will.  I think that if

13   we're going to have a guideline system that is based on kind of

14   a rational sensible approach of these things, there ought to be

15   some distinction in a guideline between everything, except less

16   than ten rifles, handguns or shotguns, that could fall under

17   this base offense level 26.

18        Because the 56 or so pages of the Export Control Act,

19   or the regulations that tell what is subject to the act,

20   includes all kinds of stuff.  And it includes many things which

21   are far more serious in terms of their effect on the U.S. -- or

22   the U.S. troops than other things.

23        And so if everything from exporting a military

24   helicopter to exporting night vision goggles to exporting

25   chemical weapons to exporting the technology of the light

1    interference filter, as ITT did, if it all falls under 26, and

2    if the way you got to the distinction where they divided two

3    base offense levels so that you have to choose between 26 and

4    14 is by amending the guideline that previously existed and

5    saying as you amended it the commission did, we're not

6    intending to change things here.

7         You have a system where you could say, I would urge

8    the Court to say that this isn't a sensible way to articulate

9    the base offense levels.  It doesn't make any sense.  You might

10   be able to say, and probably could, Look, at the very least

11   we're going to start with 14.  We'll start with 14, but there's

12   got to be something between 14 and 26 that covers things other

13   than just everything under the sun.

14        Because the export control list includes stuff like

15   uniforms and helmets and things like that.  So one way to deal

16   with it is to say, as a policy, this doesn't make any sense,

17   particularly in light of the commission's assertion that they

18   were not trying to change much about the prior guideline and

19   then picked some other number.  That's what the court did in

20   Oldani.  And I suppose another way to get at the same thing

21   would be to think that there ought to be a variance in this

22   case.

23        But I think the fundamental policy of the commission

24   articulated in this guideline is unsound.  And I think the

25   Court ought to exercise its prerogative under Kimbrough to say

 1    so and then pick a different base offense level and start from

 2    there and calculate the guidelines after having picked that.

 3           THE COURT:  Did you want to speak to your role in the

 4    offense objection?

 5           MR. WOLFF:  Just briefly.  We haven't belabored this

 6    in our argument, but I think essentially this is a case where

 7    the people involved were basically more or less involved at the

 8    same level -- at least the people who were prosecuted.  Here

 9    you could make the case possibly that those whose cases were

10    dismissed here because they received fines and 30 or 45 days

11    confinement under the military justice system were --

12           THE COURT:  Lost rank.

13           MR. WOLFF:  What's that?

14           THE COURT:  They lost rank as well.

15           MR. WOLFF:  Right.  So they were fined, they lost

16    rank, and they were confined.  I think the longest one was

17    45 days, but I could be wrong about that.

18           THE COURT:  I think there was a 90, but go ahead.

19           MR. WOLFF:  In any event, those were the people who

20    basically were not really involved.  They came to kind of watch

21    over when the meeting was taking place with the undercover

22    cooperating witness and the defendant.  As the defendants were

23    prosecuted, it seems to be that they were more or less at the

24    same level.  They were all participants in the offense and,

25    even if one takes the view that Mr. Mathers suggested the

1    offense, the guideline is clear that that's not enough to get

2    the supervisory role.  So I think the Court should not apply

3    that two-level adjustment.

4           THE COURT:  Thank you, Mr. Wolff.

5           Mr. Thomas.

6           MR. THOMAS:  Yes, Your Honor.  The policy statement

7    that was argued by Mr. Wolff is set forth in U.S. v. Oldani.

8    Your Honor, that was followed in one case, U.S. v. Oldani.  The

9    other cases were based on an offense level of 26.  And if there

10   was a lower sentence, it was based on a variance, Your Honor.

11          The government believes that the correct offense level

12   is 26 for several reasons, based on case precedent.  Also, the

13   primary premise of the U.S. sentencing guidelines is that

14   sentences be consistent.

15          In this case, level 26 has been used for both the

16   co-defendants Carper as well as Abrams.  Carper receiving a

17   30-month sentence and Mr. Abrams receiving 57-month sentence.

18          For those reasons, Your Honor, the government believes

19   level 26 is correct.

20          THE COURT:  And as to the role in the offense,

21   Mr. Thomas?

22          MR. THOMAS:  I'm sorry, Your Honor.  With respect to

23   the role in the offense, Your Honor, there are facts within the

24   presentence investigation report that supports that

25   enhancement.  Your Honor, with respect to the other

1    co-defendants who were initially indicted, I believe that's

2    paragraph 33 in the presentence investigation report, it talks

3    about how the other defendants Vaughn, defendant Shultz, Flegm

4    and Vaught.  They came to Mr. Mathers' residence.  And when

5    they got there, the group sat down to discuss what they were

6    going to do that night.  And they were going to sell those

7    eight night vision goggles to who they believe was the person

8    that would eventually ship them to China who was a confidential

9    undercover officer.

10        Your Honor, the person giving the directions to

11   everybody was defendant Mathers.  Also, even before that night,

12   when they were setting up that transaction, they met with an

13   undercover officer and also the confidential informant.  And

14   the confidential informant showed Mathers the eight Generation

15   3 devices that were going to be sold.  So it was Mathers that

16   was doing the negotiation.  It was Mathers who sold the five

17   night vision goggles to Carper, which were eventually sold in

18   Japan and Poland.  Your Honor, he's at the forefront.  He is

19   the one common denominator amongst all the defendants.  And so

20   the enhancement should be applied, Your Honor.  Thank you.

21        THE COURT:  Okay.  I'm going to start with the ruling

22   on the role in the offense.  And I am in agreement with

23   paragraph 53 which sets out the reasons for the plus two

24   enhancement.  I do find that the defendant was a leader,

25   manager or supervisor of the criminal activity.  He advertised

1    for sale of three devices on E-bay and communicated with the

2    cooperating witness to arrange for the sale of three devices.

3    He recruited Abram to attend two meetings with the cooperating

4    witness and promised him half the proceeds of the sale.

5          And the -- according to Abram's statement, he and the

6    defendant recruited Shultz to provide protection and

7    surveillance for their meeting.  Vaughn told the investigators

8    he was recruited by Abrams and stated that the briefing prior

9    to the 10/28/08 attempt to sale, the defendant provided

10   directions to Vaughn, Shultz, Flegm and Vaught about the

11   surveillance and protection of the meeting.  I think that's an

12   error there.  It should be four of them.  The four people who

13   had the military discipline.

14         It is my understanding that it was the defendant who

15   acquired the devices that were in question.  He's the one that

16   stole them.  So I believe that the evidence is there that he

17   provided management and supervision and leadership with respect

18   to the others.

19         Abrams obviously was a full participant, but Abrams

20   said it was respect to him suggested by Mathers.

21         Now as to the question with respect to the proper

22   application of the Section 2M5.2(a)(1) or (2).  I don't see how

23   we could read 14 to apply in this case.  It states, If the

24   offense involved only non-fully automatic small arms (rifles,

25   handguns, or shotguns) and the number of the weapons did not

1    exceed ten.

2          It appears to me that this is an effort to carve out

3    some small guns and some ammunition aspects that are really

4    going to be often the subject of some kind of commerce and to

5    take them out of what is otherwise military aspects of the

6    military performing its job.

7          And I believe that the United States v. Carper, which

8    is 659 F.3d 923, the Ninth Circuit decision in 2011, forecloses

9    an interpretation that this is some kind of mistake to put them

10   into 26.  Now that's the first aspect.  I believe it's been

11   ruled on, and I agree properly.

12         The second is the policy issue.  And in looking at the

13   policy question, the defendant has the question with respect to

14   whether or not these are things having an impact on the safety

15   and the mission of the military.  And we have the testimony

16   from Colonel McDonnell.  And in paragraph eight he says, "This

17   technology gives our U.S. and allied forces a decisive combat

18   advantage, enhances the principles of surprise, maneuver, and

19   security, as well as our ability to apply very discriminate

20   firepower against identifiable belligerent enemy forces while

21   avoiding unnecessary collateral damage to innocent civilians.

22   This decisive advantage is also critical in reducing the high

23   risk to our forces inherent in these operations.

24         "By illegally transferring or attempting to illegally

25   transfer this important night vision technology to foreign

1    countries, the defendants have directly jeopardized the

2    tactical advantages that enable our soldiers to fight more

3    effectively and safely at night."

4          Now in the application of the 2M5.2, application note

5    it says, "In determining the sentence within the applicable

6    guideline range, the court may consider the degree to which the

7    violation threatened a security or foreign policy interest of

8    the United States, the volume of commerce involved, the extent

9    of planning or sophistication, and whether there were multiple

10   occurrences. Where such factors are present in an extreme form,

11   a departure from the guidelines may be warranted."

12         Now, it says "in an extreme form."  Even a uniform can

13   be something that jeopardizes the military mission.  How many

14   times have we read about in the war zones that people were

15   taken off guard because they were in the wrong uniform and

16   something happened to have people lower their guard to their

17   disadvantage because somebody was wearing a uniform that misled

18   the United States forces or civilians in that situation to be

19   placed in jeopardy or injured or killed.

20         The question I think is, what's the purpose of these

21   things and whether or not they do interfere with the military

22   mission?  And in this situation, the Court has before it

23   evidence of how important this technology is and the advantages

24   it gives to the military in their mission.  And there really

25   isn't anything that has been put forward other than an

1  invitation to look behind the list and make my own

2  distinctions.

3          But I think it's up to the defendant in a particular

4  situation to show that the distinctions that have to be made to

5  make it not a threat to the mission, and that has not been done

6  here.

7          It isn't as if these rifles were sold to a couple of

8  hunters in Minnesota.  That's not what happened here.  So I do

9  not agree with the policy argument, and I believe there's

10  sufficient evidence here to support the position of the

11  government.

12          Now, the Court has adopted the factual statements

13  claimed in the presentence investigation report to which

14  there's no objection and has resolved the disputes as I have

15  indicated.

16          The Court is placing the presentence report in the

17  under seal if an appeal.  If an appeal is taken, counsel on

18  appeal may be permitted access to the sealed report.

19          Now, the Court has found the -- there are so many

20  papers up her.  I just have to get my hands on the presentence

21  report that we are dealing with and the sentencing guidelines

22  which were in the document prepared on 6/26/2012 and attached

23  to the presentence report that was issued on the 26th of this

24  month.

25          The court adopts the total offense level of 25,

1     criminal history Category 1.  The advisory guidelines provide

2     for custody as to Counts 1 and 3, 57 to 60 months.  As to

3     Counts 4 through 11 -- it says 4 and 11, but I believe it

4     should read 4 through 11, 57 to 71 months.

5            The defendant is not eligible for probation.

6     Supervised release range is two to three years.  Fine range as

7     to Count 1 and 3, 10,000 to $250,000.  As to Counts 2, 4

8     through 11, 10,000 to $1 million.

9            Ms. Eversole, I'm looking here at the provisions with

10    respect to custody, and Count 2 should be included --

11            THE PROBATION OFFICER:  Yes.

12            THE COURT:  -- under.

13            THE PROBATION OFFICER:  So it should be as to Count 2

14    and 4 through 11, 57 to 71 months.

15            THE COURT:  Yes, okay.  I just want to make sure we

16    have this correct.  So I'm correcting that on the record.

17            Did I read the fine as to Counts 2 and 4 through 11,

18    10 thousand to $1 million.  Restitution in the amount $39,677

19    and a special assessment of $100 per count, and there are 11

20    counts, so it's $1,100.

21            Okay.  Now, this is your opportunity to speak to

22    sentencing, Mr. Wolff.  And you may raise your other arguments

23    at this point which I believe are relevant to sentencing.

24            MR. WOLFF:  So, Your Honor, what I think is one of the

25    most important factors in the Court's determination on what the

1    proper sentence should be here, has actually seemingly been

2    overlooked by the probation department in their recommendation.

3    And that is the forensic evaluation that took place at the

4    medical center at Butner.  And what's significant -- well, the

5    whole thing is significant, but what I think is particularly

6    significant is the diagnosis of post traumatic stress disorder.

7    Because there's a couple of things that one could infer about

8    post traumatic stress disorder or conclude about it.

9            One is that it's not likely to be properly treated in

10   the Bureau of Prisons.  And the reason why I'm at least quite

11   confident of that is that after this diagnosis was rendered,

12   and Mr. Mathers was being interviewed and consulting with the

13   psychological services people here at FDC Honolulu, he was

14   talking to a woman who was there I think, probably he is not

15   sure, doing the practical part of her work to getting a

16   doctorate in psychology.  And she expressed to him the view --

17           THE COURT:  Who are we talking to?  I'm sorry?

18           MR. WOLFF:  It was a person who is at the FDC in their

19   psychological service's unit.  But as far as he could tell, she

20   is not a permanent employee of the Bureau of Prisons, but she's

21   probably --

22           THE COURT:  Do we have a name?

23           MR. WOLFF:  I can't remember.  He doesn't remember the

24   name, Your Honor.

25           But she indicated she was not going to be there for

1   very long.  So she suggested to him that one of the things that

2   might be done to assist him with PTSD was to go through some

3   sessions involving breathing exercises that I guess would help

4   to relieve stress and so forth, which he was somewhat skeptical

5   about.

6          But putting that aside, he asked her, well, how long

7   would that take?  What would be involved?  And she said it

8   would need ten sessions.  And then he said, Well, are you here

9   to do the ten sessions?  She said no she would have to leave.

10   Her tenure there was going to end after two sessions.

11          So that's kind of an indication of the kind of

12   problem.  And it ties into the injunction in 3582 and the

13   Supreme Court's evaluation of that in the Tapia case in which

14   the court said that both congress and now the court have taken

15   the view that if you're looking to rehabilitate someone, don't

16   think it's going to happen in the prison because congress has

17   taken the view that imprisonment won't -- is not a suitable

18   place for rehabilitation.

19          And so in determining whether to send the person to

20   prison or how long to send them for, picking the choice of

21   prison or picking the length of the prison sentence with a view

22   towards effectuating rehabilitation is something that can't be

23   done.  And that just makes practical sense, given what we know

24   about the way prisons work.

25          So in determining what the sentence should be, one

1  needs to look at other things.  Now, I think the PTSD is

2  important for another reason.  Because I think it gives us some

3  insight into what caused or why these crimes were committed in

4  the first place.

5        And the Court can see from the presentence report that

6  Mr. Mathers doesn't have a prior record, that he doesn't have

7  any prior arrests, and that these offenses sort of represent --

8  seem to represent a period in his life when he was acting in a

9  way that's inconsistent with how he has conducted himself

10  previously.

11        I think it's also relevant that these offenses were

12  committed at a point when he was quite upset and resentful

13  against the way he was being treated by the Marine Corps.  He

14  was pretty seriously injured, but it's the kind of injury that

15  doesn't show.  And the basic manifestation of it is pain.  And

16  it seems like it's an injury, if you a credit the various

17  medical people who have examined him, that there is really not

18  a whole lot than can be done about it in terms of making the

19  pain go away.

20        So in that context he became involved in these

21  offenses, he committed them, he knew they were wrong; that's

22  why he pled guilty.

23        But the kind of sentence that was imposed on his

24  co-defendants, I would submit, is just longer than it needs to

25  be in order to carry out the purposes of sentencing that are

1   necessary.  And a long prison sentence is going to be

2   counterproductive in terms of treating the post traumatic

3   stress disorder which is treatment that he needs.

4        So my view is that a sentence lower than what was

5   imposed on the two co-defendants would be appropriate.  Now, of

6   course, that raises a question of disparity.  And what's

7   inappropriate is an unwarranted disparity.  And what's also

8   inappropriate is the converse of that, which is an unwarranted

9   similarity between sentences.

10        And one of the curious things about these cases is

11   that when you look at the collection of cases that have been

12   prosecuted over the years, it seems like people who committed

13   way more serious versions of this same offense seem to have

14   gotten quite a bit smaller sentences.  Not to exclude the ITT

15   corporation itself.

16        So the concern that the court expressed about how the

17   escape of this technology overseas can endanger U.S. troops is

18   certainly a legitimate concern.  But it's pretty remarkable

19   that you could sell an NVG to some guy in Japan, as Mr. Mathers

20   did, who might be capable of reverse engineering the light

21   interference filter, but more likely isn't, or you can actually

22   export the technology itself to the People's Republic of China,

23   as ITT did, and they didn't prosecute any single person.  Only

24   the corporation itself paid a big fine and a big payment to

25   this department of state and so forth just strikes me there's

1    something fundamentally wrong about that.  That that's the way

2    the justice system works.  And we're really talking about the

3    same technology.  So it's not as though something else was

4    exported.

5         The other people around the country who have been

6    prosecuted for these offenses have -- many of them would strike

7    me as more serious exporting various arms to Iran or to the

8    Hezbollah militia in Lebanon or things like that.  I'm not

9    trying to defend this behavior, it's illegal, and Mr. Mathers

10   is not trying to defend it either.  It seems that in context

11   that it is -- that the sentences imposed in this case and is

12   recommended in this particular case is sort of out of

13   proportion to how these cases have been handled around the

14   country and historically.

15        And given the lack of a prior record, given the

16   likelihood that Mr. Mathers can go on to live a productive

17   life, that he's not I don't think a high candidate for

18   recidivism, I think that a sentence -- we'd recommend a year

19   and a day.  And I still think that would be an appropriate

20   sentence.  But if the Court thinks that more is necessary,

21   well, that's the way life is.

22        But a sentence of three years or almost five years I

23   think is just too much here.  And sometimes when you go last in

24   a case there's an advantage when you're talking about

25   sentencing of co-defendants.  The other two guys got sentences

1    that I think are too long, well, then it's a disadvantage.  But

2    I still think that this Court is required to and should make an

3    independent judgment that in Mr. Mathers's particular case a

4    sentence below that, because of his particular circumstances,

5    including the need to address the PTSD and the likelihood that

6    the PTSD clouded his judgment and is in some way a factor

7    related to his commission of the crimes, ought to be taken into

8    account.  And, therefore, he ought to receive a lesser

9    sentence.

10          THE COURT:  Thank you, Mr. Wolff.

11          Mr. Mathers, this is your opportunity to address the

12   court.  If there's anything you want to say about yourself or

13   about the crimes to which you've pled guilty, this is your

14   opportunity to do so.

15          THE DEFENDANT:  Your Honor, I understand the

16   seriousness of the crime I committed.  I apologize to the

17   government and to the Marine Corps.  I never considered the

18   impact of what I was doing.  I would never intentionally hurt

19   my fellow marines.  I will always regret my actions.  Over the

20   times since the case started, I have come to have more respect

21   for the law.

22          And I am continually trying to better myself and make

23   sure that nothing like this ever happens again.  Thank you,

24   Your Honor.

25          THE COURT:  Thank you, Mr. Mathers.

1          Mr. Thomas, remarks on behalf of the government.

2          MR. THOMAS:  Your Honor, with respect to the nature

3     and offense of these cases, it's important to point out that

4     these offenses to which Mr. Mathers pled guilty to occurred

5     over a period of six months.  And these 11 counts are separate

6     and distinct acts requiring that the elements of the offense be

7     met 11 times over a period of six months.

8          Now, Your Honor, if we step back and look at what

9     Mr. Mathers's conduct was, we could see that the egregiousness

10    of it.  First, he actually had to steal the property.  He had

11    special access to the armory, and he used that access to steal

12    over 29 night vision goggles.

13         Now, he didn't just confine these illegal acts to

14    himself.  He recruited other marines like himself who were

15    disloyal to the corps.  We talked about that earlier that he

16    was a supervisor.  And then he also recruits Carper and sells

17    five NVGs for $1,000 each, and Carper is convicted for that,

18    and he received 30 months.

19         THE COURT:  36 months.

20         MR. THOMAS:  36 months.  Sorry, Your Honor.  But

21    Mr. Mathers goes even beyond that.  Because on his own, on nine

22    different occasions, he sells night vision goggles to a

23    resident of Japan.

24         And then after we discovered these advertisements on

25    E-bay, we conduct an undercover operation and Mr. Mathers,

1   under the guise of the undercover operation, is willing to sell

2   eight more NVGs knowing that the eventual outcome is that this

3   person was going to ship it to Hong Kong in China, Your Honor.

4            Your Honor, what really -- the government can't put it

5   in any better words than what Colonel McDonnell stated in his

6   affidavit.  But the impact of his acts and the circumstances

7   that he created by selling these NVGs, Your Honor, when we look

8   at Mr. Mathers himself, and we question how could he possibly

9   do these things, obviously it boils down to he wanted some

10  money.

11           So he creates this security risk to the United States

12  and to his fellow marines, and in return he gets about $36,000,

13  Your Honor.

14           Now Mr. Wolff brought out the fact that a critical

15  importance is the fact that Mr. Mathers was diagnosed as

16  suffering from post traumatic stress disorder.  But you know

17  it's a little bit contradictory to say that he's not going to

18  receive adequate treatment when in fact it was the BOP facility

19  that made that diagnosis.

20           And it was also the opinion of the doctor that what

21  the treatment was.  And he didn't have any reservations that

22  the appropriate treatment could not be furnished by the Bureau

23  of Prisons.

24           Your Honor, there have been sentences which

25  individuals who suffered from post traumatic stress disorder

1    may have received a lighter sentence.  But there are

2    distinctions from those individuals, Your Honor.  As an

3    example, in the US v. O'Donnell that we had talked about

4    earlier, in that case that individual had served two tours of

5    combat duty.  He received his diagnosis and was forced to give

6    up his military career which would talk about the severity of

7    it.

8           In addition, even after that diagnosis, he worked hard

9    to improve his position in life.  Going so far as to receive a

10   3.9 in an undergraduate degree and a masters in business

11   administration.

12          Your Honor, that's the type of person that received

13   that type of variance.  And the court's desire was that that

14   upswing in that individual's efforts would not be deterred by a

15   long period of confinement.  We don't have that in this case.

16   In fact, we have the exact opposite.

17          Your Honor, in the addendums that are attached to the

18   presentence investigation report, what we have is that

19   Mr. Mathers contributed himself to his situation because he,

20   first of all, abused alcohol, and then he abused the

21   prescription medication that was given to him for the problems

22   that he was diagnosed with, his groin injury.  So we have

23   efforts on himself by Mr. Mathers not to improve his situation

24   but to make it worse.

25          Also, Your Honor, there are representations in the

1    addendum where Mr. Mathers himself failed to follow through

2    with the repeated recommendation of the doctors.   So

3    Mr. Mathers, he can say that he's sorry, but the actions don't

4    show that.

5           And as a former marine, Your Honor, I'm not

6    discrediting Mr. Mathers's former service.   But he was in Iraq

7    for six months.   He arrived in September of 2007, was injured

8    in October 2007 and, from that point on, was put on light duty

9    and then returned to Hawaii in February of 2008.   That was his

10   service in Iraq.

11          Your Honor, the Court is aware of the other sentences

12   imposed in this case.   The Court is aware of the notoriety that

13   this case received, and it's fair to assume that not only

14   people in the marine corps especially, but others know about

15   this case.   And the reason why the government wanted to admit

16   Exhibit 4 is to show the extent of the planning by Mr. Mathers.

17   To the extent that he would research the law and it was

18   specific.   It cites federal regulation.

19          And despite that kind of effort, which takes a lot of

20   effort for a person not trained in the law to know that, he

21   directly contravenes that regulation.   Goes against it, not

22   once but 11 times, knowing of what he's doing.

23          What does that show?   That shows complete disrespect

24   for the law.   Your Honor, it shows that he is not taking this

25   seriously.   Why?   So he can make money.   Even in light of the

1    risk to our nation, even in light of the oath that he swore to

2    defend the constitution of the United States.

3            Your Honor, because of the notoriety as well, the

4    government believes that another factor is to afford adequate

5    deterrence.  The Court agreed that Mr. Mathers was a

6    supervisor, and it would make no sense where he would receive a

7    sentence lower than his co-defendants.  He was the top guy.  He

8    had everything in common with everything related to this case.

9    He stole it, he gave some to Carper, he talked to Abrams with

10   regard to the eight NVGs; but guess what, he went beyond that.

11   Mr. Mathers had seven other NVGs in his residence.  Mr. Mathers

12   sold nine other NVGs to a resident of Japan.

13           He should be above and beyond what his co-defendants

14   received, Your Honor.  And the government supports the

15   recommendation of the probation office and believes that at the

16   minimum it should be 57 but should extend even to the mid

17   range.  Thank you, Your Honor.

18           THE COURT:  Thank you Mr. Thomas.

19           Anything further, Mr. Wolff?

20           MR. WOLFF:  Yes, Your Honor.

21           Your Honor, despite his words, I think Mr. Thomas is

22   disrespecting Mr. Mathers's service in the marine corps.

23   There's no accounting for why one individual gets post

24   traumatic stress disorder after a relatively short time and

25   some people never get it except for the individual variations

1    in human beings.

2          And the other aspect of it is this.  The diagnosis was

3    made by the psychologist at Butner recently.  When a person has

4    a serious mental health problem, they may know that there's

5    something not quite right with them.  But if they don't know

6    what it is, and if they don't know how to deal with it, and

7    they are not receiving any treatment for it, articulating the

8    proposition that when they act to some extent because of that

9    illness that they're making conscious decisions to do the wrong

10   thing is just completely inconsistent with what anybody who

11   knows anything knows about how mental illness works.

12         So the fact that Mr. Mathers was unable to get it

13   together to pursue the question of what to do about his chronic

14   pain or to deal in a particularly productive way with the

15   symptoms of PTSD, when he didn't know he had the problem,

16   strikes me as just nonsensical.  You can't deal with a problem

17   unless and until you know what the problem is and how to deal

18   with it.  Now he knows.

19         So I think that the fact that he doesn't have the

20   wherewithal mentally or educationally to have obtained an MBA

21   or a high grade point average in college that that should be

22   held against him or that should --

23         THE COURT:  Well, I don't think you can say that it's

24   being held against him.  What Mr. Thomas was pointing out was

25   the exemplary behavior of the defendant in that case which the

 1   court was relying on in giving a variance.

 2          MR. WOLFF:  Right.

 3          THE COURT:  It's not a matter of holding it against

 4   him.  It's just a showing that there isn't a community of

 5   behavior with respect to that case in your client.

 6          MR. WOLFF:  Well, that's true.  But, on the other

 7   hand, I think that the implication was that during the three

 8   and a half years that this case has been pending that

 9   Mr. Mathers should have gone to college or got his MBA was

10   clearly there.  And the fact that he didn't reflects the fact

11   that, number one, the pressure of this case and the fact that

12   he was held over in the marine corps, they wouldn't let him go.

13   They held him and held him pending discharge and then finally

14   they did discharge him.  And then his family fell apart, and he

15   has been trying to deal with that.  It's clear from his suicide

16   attempt that he has some severe problems that were not being

17   addressed.  Those are not going to be properly addressed by a

18   longer prison sentence as opposed to a smaller one.  And that

19   was the point I was trying to make.

20          So basically that's all I have to say about that.

21          THE COURT:  Thank you, Mr. Wolff.

22          I want to be clear, given the question with respect to

23   the policy matters that was raised, that the Court recognizes

24   that it has the discretion to depart from the United States

25   sentencing guidelines based on policy reasons pursuant to the

1    Supreme Court's decision in United States versus Kimbrough. But
2    I am declining to exercise that discretion.  I find that
3    Section 2M5.2(a) of the sentencing guidelines is a rational
4    guideline that comports with the factors to be considered in
5    imposing a sentence pursuant to Title 18 Section 3553 of the
6    United States Code.
7            The defendant's motion for a downward departure based
8    on that policy consideration is denied.  The Court just wants
9    that to be clear, if there is an appeal, that I did consider
10   that and do not agree with it.
11           Now, I want to look at who Mr. Mathers is, and I can't
12   agree with the defendant's position that all of his problems
13   stem from his injury and post traumatic stress syndrome.
14           In his own report, he socialized with a bad crowd in
15   school, and he related often skipping school and getting in
16   trouble repeatedly with school authorities for damaging school
17   property, fighting, and using alcohol excessively.  He
18   remembered being suspended from and expelled from school.
19           One of the aspects here is, you know, who is being
20   sentenced?  We're not sentencing a person who has not had
21   problems other than this.  The question of his PTSD is an
22   important one.  The question of his suicide attempt is an
23   important one.  But the factors that are contributing to it
24   appear to be more complex than just somebody who comes into the
25   military and has the experience of going into combat and then

1   comes back with an injury and therefore then determines that

2   he should do something actively against the military.  Because

3   that's what happened here.

4        He didn't come back and passively be unhappy.  He took

5   steps that are really surprising, given the fact that he did

6   hold himself out to be from a military family and have a great

7   respect for that tradition.  But we have the theft of the 29

8   night vision goggles, we have him selling them to Japanese

9   nationals, we have him contracting to sell more.

10        And as Mr. Thomas has pointed out, it's over a long

11  period of time.  When you think about the amount of time that

12  went into his military training and the amount of experience

13  that he had, which you would think would promote loyalty to the

14  other troops and a desire to protect them, having experienced

15  being in a combat zone, that puts a light on his behavior that

16  shows it to be knowing and willful.  More so than just a

17  civilian that might have done something like this.  It's of a

18  different category.  It isn't just a casual thing.  It is a

19  person who is rejecting everything that the marine corps stood

20  for.

21        And that has to color how you look at his actions.

22  His alcohol abuse, his prescription drug abuse, and the context

23  of his behavior over this period of time, and the fact that he

24  was a leader in this situation.  It doesn't make any sense in

25  terms of sentencing disparity for Casper (verbatim) who got the

1   devices from him and then sold them to have a longer sentence

2   than him.  It makes no sense.

3          With respect to all the other sentences that have been

4   put forward by the defense, it's very difficult to make an

5   analysis to each one of those because we don't have enough

6   information in many of them, and we can't dissect every

7   sentence ever given as to other defendants and ignore the

8   fundamental judicial tradition for the judge's sentencing to

9   consider every convicted person as an individual and every case

10  is a unique study in human failings.

11         I am taking into account his problems at sentencing,

12  but I do not want to diminish the gravity of what he did.  It

13  is not just somebody who got injured in the war and was unhappy

14  about it.  He rejected what he claims to have stood for and in

15  a methodical knowing way, having the -- knowing about the

16  regulations, having considered that in going forward, and

17  getting other marines to assist him, it is a -- it's a grievous

18  crime.

19         Now, I am taking into account however the fact that he

20  was injured and the fact that he does have the PTSD.  And he

21  clearly has mental problems, there is no doubt, and that has

22  been diagnosed.  And that is helpful to the Court to have those

23  things for the Court to consider.

24         Now, I am sentencing him, taking into account his

25  injuries, and I do believe Abrams having the gun makes a

1   difference as well, having the gun was an additional charge, I

2   am sentencing him to 48 months.  And that is as to Counts 1

3   through 11  and all terms to run concurrently.  And the

4   downward departure is based on his physical and mental

5   infirmities and the fact that they come from his service.

6          Now, he is not eligible for probation.  As to

7   supervised release, I am giving him three years as to Counts 1

8   through 11, all terms to run concurrently.  I'm not imposing a

9   fine because I don't believe he can pay it.  I am imposing

10  restitution in the amount of $39,677 and a special assessment

11  of $100 per count for $1,100.  And there are conditions, if you

12  would rise for the conditions, Mr. Mathers.

13         One, you shall abide by the standard terms and

14  conditions of supervision.

15         Two, you shall not commit any crimes, federal, state,

16  or local.

17         Three, you shall not possess illegal controlled

18  substances.  And you need to pay a attention to that,

19  Mr. Mathers.  I am going to recommend that you have drug

20  treatment -- drug and alcohol treatment while you are

21  incarcerated, because you will be followed when you were

22  released.  And violations with respect to drug and alcohol

23  taking will be something that could send you back to prison.

24  You need to concentrate on that, and you need to concentrate on

25  putting that behind you.

1              Number four, you shall cooperate with the collection

2      of DNA as directed by the probation officer.

3              Number five, you shall refrain from any unlawful use

4      of a controlled substance, and you shall submit to one drug

5      test within 15 days of commencement of supervision, and at

6      least two drug tests thereafter, but no more than eight valid

7      drug tests per month during the term of supervision.

8              Number six, you shall participate in and comply with

9      substance abuse treatment, which includes drug and alcohol

10     testing in a program approved by the probation office.

11             Number seven, you shall not possess a firearm,

12     ammunition, destructive device, or any other dangerous weapon.

13     You need to be aware of that, Mr. Mathers, because as a

14     convicted felon, that is something for which you can receive a

15     long sentence.  So that is something you need to be aware of

16     that you cannot have those things in your home or be around

17     them.

18             Number eight, you are prohibited from possessing and

19     using any alcohol to include in your residence, on your

20     property, and you shall submit to alcohol testing during the

21     term of supervision.

22             You shall also warn any other residents and/or guests

23     that you are prohibited from the possession and use of alcohol

24     on the premises pursuant to this condition.  And I want to

25     point out that you have had problems with alcohol in the past

1    and that is why I am imposing this condition.  It isn't just

2    something that is not based on your history.

3              Number nine, restitution of $39,677 is due to the U.S.

4    Marine Corps, DFAS-DE P.O. Box 979038, St. Louis, Missouri,

5    63197-9000.  And any remaining balance upon release from

6    confinement to be paid during the period of supervision on an

7    installment basis according to the collection policy of the

8    probation office, but at a rate not less than ten percent of

9    your monthly gross income.

10             Of this amount, $7,214 in restitution is ordered

11   payable jointly and severally with co-defendant Charles Carper.

12   Interest is waived while you were serving your term of

13   imprisonment and you shall commence to accrue interest on any

14   remaining balance upon release on supervision.

15             Number ten, you shall execute all financial disclosure

16   forms and provide the probation office and the financial

17   litigation unit of the U.S. Attorney's office access to any

18   requested financial information to include submitting to

19   periodic debtor's examinations as directed by the probation

20   office.

21             Number eleven, you are to participate in a mental

22   health program at the discretion and direction of the probation

23   office.

24             Number twelve, you shall submit your person, property,

25   house, residence, vehicle, papers, computers, as defined by

1   Title 18 United States Code Section 1030(e)(1), or other

2   electronic communications or data storage devices or media or

3   place of employment to a search conducted by the United States

4   Probation Office.

5        Failure to submit to a search may be grounds for a

6   revocation of release.  You shall warn any other occupants that

7   the premises may be subject to search pursuant to this

8   condition.

9        An officer may conduct a search pursuant to this

10  condition only when reasonable suspicion exists that the

11  defendant has violated a condition of the supervision at the

12  area to be searched contain evidence of this violation.  Any

13  search must be conducted at a reasonable time and in a

14  reasonable manner.

15        Now, I want to indicate that there are other

16  recommendations that I am making to the Bureau of Prisons.  You

17  can sit down if you want, Mr. Mathers.  Dr. Gutierrez found

18  that you are competent to proceed and opined that you do not

19  require custody for care or treatment in a suitable facility,

20  i.e., a medical center.  So I am recommending that you are to

21  receive treatment for PTSD and your other mental problems and

22  your physical problem, including psychotropic medication,

23  individual or group therapy, mandatory substance abuse

24  education treatment, and your mental status and risk for

25  suicide be evaluated on a regular and frequent basis.

1           And that is -- I'm taking that from paragraph 79G.

2     And I would like those matters included in the sentencing

3     recommendations, Ms. Sai, if you would see that that paragraph

4     79G is included.  I also recommend that you get vocational and

5     educational training.

6           Now, this sentence may be appealed and your right to

7     appeal is within 14 days of judgment being entered in your

8     case.  And failure to appeal within the 14-day period will be a

9     waiver of your right to appeal.  The government may file an

10    appeal from this sentence.

11          You are advised that you are entitled to the

12    assistance of counsel in taking an appeal.  If you are unable

13    to afford a lawyer, one will be provided for you.  If you are

14    unable to afford the cost of an appeal, you may apply for leave

15    to appeal forma pauperis.  And if so, the clerk of court will

16    file a notice of appeal on your behalf.

17          Okay.  Are there any requests with respect to

18    placement?

19          MR. WOLFF:  Yes, Your Honor.  I would ask the Court to

20    recommend the Federal prison camp at Terre Haute, Indiana.  As

21    the Court knows, Mr. Mathers's family lives in Indiana.

22    There's a federal correctional complex at Terre Haute which

23    includes a penitentiary and FCI and a satellite camp.

24          Given the length of sentence and his lack of prior

25    record, I think he would be probably qualified for the camp.

1          In addition, there's two other matters that I would

2     like to address if I may.

3          THE COURT:  Okay.  What are they?

4          MR. WOLFF:  One is that the Court indicate that

5     Mr. Mathers could be released for supervision to the District

6     of Indiana.  Unless the Court required him to, there wouldn't

7     be a reason why he would come back to do his supervision in

8     Hawaii.  And the other --

9          THE COURT:  Do you have a problem with that,

10    Mr. Thomas?

11         MR. THOMAS:  No, Your Honor.

12         THE COURT:  Okay.  And the Court will so recommend.

13         MR. WOLFF:  And the other one, Your Honor, has to do

14    with the waiver of interest on restitution.  I know the Court

15    indicated it was waived during the period of incarceration.  I

16    would ask that the Court waive Mr. Mathers's requirement to pay

17    the interest while on supervision, at least until his income

18    would exceed the poverty level or maybe 125 percent above

19    poverty level.  Because if it starts right away, given the

20    problems one has as a convicted felon in getting employment,

21    the interest will be moving faster than his ability to pay

22    restitution, if he's not earning much money, and it will be

23    growing rather than shrinking.

24         Of course if he reaches 125 or 150 percent of the

25    poverty level, then it would be okay that the interest kick

1   back in.  So that would be my request.

2          THE COURT:  That sounds like something that would be a

3   totally appropriate thing to propose with respect to congress,

4   or whoever makes these rules, but I don't believe that there's

5   anything about this case that makes it something where I should

6   deviate from every other sentence that I've ever imposed.  And

7   I think that is a policy question that should be addressed on a

8   systemic basis.  I can understand why you feel that way, but I

9   would be more impressed if he had made more of an effort in

10  terms of working a job when he was out on bail.

11         So I think any incentive to get him into the work

12  force and producing is probably a good thing, Mr. Wolff.

13         MR. WOLFF:  All right.

14         THE COURT:  So I'm going to deny your second request.

15         Okay.  Is there anything else that the Court -- I

16  would just want to be clear.  Is there an Exhibit 1 you wanted

17  to put in, Mr. Thomas?

18         MR. THOMAS:  No, that was just a demonstrative aid

19  that I decided not to use.

20         THE COURT:  Okay.  So 2, 2A, 3 and 4 limited to the

21  two pages.

22         And you had no exhibits, Mr. Wolff?

23         MR. WOLFF:  That's correct.

24         THE COURT:  And Exhibit 2A is going to be limited,

25  according as I indicated, it's just going to be the portions of

1    that transcript that are the testimony of the colonel.  There's

2    no point in putting in the rest of it.

3              Anything further?

4              MR. THOMAS:  Yes, Your Honor, the government moves to

5    dismiss Count 13 as to Mr. Mathers.  It does not apply to him.

6              THE COURT:  Hearing no objection, Count 13 is

7    dismissed.  We are in recess.

8              MR. THOMAS:  Thank you, Your Honor.

9    (Recess at 12:32 p.m. )

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2              I, Gloria T. Bediamol, Official Court Reporter, United

3      States District Court, District of Hawaii, do hereby certify

4      that the foregoing is a true, complete and correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7              DATED at Honolulu, Hawaii, August 1, 2012.

8

9

10                                  /s/ Gloria T. Bediamol

11                                  GLORIA T. BEDIAMOL.

12                                  RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25